UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Case No. 4:08CR 532 DJS  (AGF) |
| TIMOTHY BRYAN ROSE, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motions filed by Defendant,

Timothy Bryan Rose.  Pretrial matters were referred to the undersigned United States

Magistrate Judge under 28 U.S.C. § 636(b).  Defendant filed a motion to suppress

physical evidence and statements.  (Doc. # 16).  An evidentiary hearing was held on

October 14, 2008.  The government was represented by Assistant United States Attorney

Robert F. Livergood.  Defendant was present and represented by his attorney, Christopher

R. Hayes.  At the hearing, the government presented the testimony of Jimmie Livingston,

who has been employed as a police officer with the City of Bridgeton for approximately

twenty years, and previously was an officer with the City of Shrewsbury.  The witness

was cross-examined extensively by defense counsel.  Based on the testimony and

evidence adduced, and having had an opportunity to observe the demeanor and evaluate

the credibility of the witness, the undersigned makes the following findings of fact and

conclusions of law.

## FINDINGS OF FACT

On the evening of April 22, 2005, Officer Jimmie Livingston was on patrol.  At approximately 10:30 or 11:00 p.m., he was in his patrol car on the parking lot of the Airport Congress Inn on Lindbergh Blvd., which is a crime area, when a black male approached his car and asked to talk to him.  The man said he was coming down the stairwell of the hotel, near room 121, when he heard a female inside the room yelling, "Stop."  He further stated that it didn't sound right to him, and he thought it should be checked out.  Officer Livingston had not seen the man before, and has not seen him since. The man said that he stayed there and did not want to share his personal identity information.  Officer Livingston did not find that unusual, as it was not uncommon in that area for individuals not to want to be associated with the police.

Officer Livingston called for backup, and within 2-3 minutes Officers Cash and Collier arrived in their patrol cars.  All three of the officers were in uniform, wearing their utility belts and sidearms, but at no time did any of the officers either activate their overhead emergency lights or display their firearms.  The three officers approached the hotel room in question.  Officer Livingston might have heard a TV coming from inside the room, but did not hear any yelling or voices.  He knocked on the door, and a male from inside the room said, "Who is it?"  He responded that it was the Bridgeton Police and asked if he could speak to them to make sure that everything was okay.  The man said, "Hold on, I need to get some clothes on."  After a minute or so passed, the officer believed he knocked a second time, and may have knocked a third time a few moments

later. The man said he was coming. A white male, later identified as Defendant Rose, opened the door wearing only pants. Approximately one and one-half to two and one-half minutes passed between the time of the first knock and the actual opening of the door.

Defendant opened the door to the hotel room approximately three-quarters of the way, and Officer Livingston could see inside the room, which had two king-sized beds and a night stand between the beds. Officer Livingston advised Defendant that he had been directed to the room by a passerby who heard a female yelling "Stop," and that they wanted to know if everything was okay. He then asked if everything was okay. Defendant did not respond, but rather stepped back, turned, and looked toward a female who was on the far bed. The female, later identified as Elaine, looked younger than eighteen years old and was wearing underwear and a push-up bra. She said that they were there just having fun with some cameras and video equipment. From where they stood, the officers could see a video camera on the night stand. Officer Livingston saw that there was also a second female in the room. She was on the bed closest to the door and had her back to him, at an angle, but he was able to see the side of her face. She was dressed in blue jeans and a t-shirt, and looked younger than Elaine. Officer Livingston was concerned because the younger-looking girl, later identified as Nicole, looked nervous or scared. Her hair was messed up, her face was blushed, she was sweating and breathing heavily, and she did not make any comments.

Officer Livingston was also concerned because he was able to see two young

females and only one older male, and although he was able to see most of the room, he was unable to see into the area where the sink and bathroom were located.  He therefore asked Defendant if there was anyone else in the room, and asked if it was okay for him to come in and look in the room, to make sure that no one else was there, for their own and everyone else's safety.  Defendant said that was fine, and Officer Livingston stepped inside and walked into the bathroom, checking for other individuals and weapons.  As he walked toward the bathroom, he could see a camcorder on the floor, partially covered by a towel, which he had to step over to enter the bathroom.  He did not see any weapons or other persons in the room.

Officer Livingston then asked the three individuals for identification to verify their ages.  Defendant Rose produced a drivers' license which showed that he was born in 1969, and was therefore approximately 35 years old.  The female dressed in undergarments, Elaine, said she did not have any identification, but provided a date of birth that indicated that she was 17.  Nicole provided her name and date of birth, which reflected she was 16 years old.  In response, Defendant stated, "She looks 20," and told Nicole to tell the truth and tell them her real age.  Because he did not want Nicole to be intimidated, Officer Livingston told Defendant, in a normal tone of voice, to sit on the bed and not to have conversation with Nicole.

In light of her indication that she was only 16 years old, and because she looked uncomfortable, Officer Livingston asked Nicole to step outside of the room with him so he could speak to her privately.  As she did so, one of the other officers stepped inside the

4

room, while the other remained in the doorway where he could observe both the room and the hallway.  Once in the hallway, Officer Livingston asked Nicole if she was okay, and she explained what they were doing there.  She advised Officer Livingston that her friend, Elaine, had introduced her to Defendant that day, and they had supplied her with beer and clothing to have sexual relations with Elaine and with Defendant.  She re-confirmed that she was sixteen years old, and further stated that they were using a camera and videotape and that she had been videotaped having sex.

Officer Livingston returned to the room and related to Defendant and Elaine what Nicole had told him, so that he could hear their side of the story.  He also stated that it is against the law to have sexual relations with her and film her.  In response, Defendant stated, "Look, she's 20."  He asked Defendant why the cameras were there, and Defendant responded that he was filming the two girls having sex in the shower.  At some point during the conversation, it is not clear when, Defendant also stated to the officers that he had just met the girls.

Officer Livingston retrieved the two cameras and the videotape, which were in plain view.  There was also a tape inside the camcorder.  He viewed the tapes and saw they were of the two girls having sex in the shower and Defendant having sex with the two girls.  The officers seized the cameras and videotapes as evidence, and Defendant and Elaine were both placed under arrest.  At no point in the hotel room did the officers make any threats or promises to Defendant.  Nor did the officers, prior to his actual arrest, ever advise Defendant that he was not free to leave.

Defendant was taken to the station, and Officer Livingston and another officer then brought Defendant to an interview room in the booking area.  Officer Livingston orally advised Defendant of his rights under <u>Miranda</u>.  Defendant said he understood his rights and agreed to speak to the officers.  No threats or promises were made to induce Defendant to make a statement.  In his statement, Defendant mentioned that Nicole looked 20, and that he would somehow get out of this.   He further stated that he had fallen "off the wagon" and was back on "meth."  When asked whether he wanted to make a written statement, Defendant responded that he did not want to, as he had done that once before and had gotten "burned."  He also said that he did not know her age, and that he should have asked, and said he was sorry.  Defendant was thereafter released pending application of a warrant.

The Detective Bureau thereafter continued the investigation and learned that Elaine was not seventeen, but rather was sixteen years old.  As a result, Defendant was arrested a second time related to his conduct with Elaine.

## CONCLUSIONS OF LAW

In his motion to suppress, Defendant seeks to suppress the cameras and videotapes seized from the hotel room, as well as the statements he made in the hotel room.  At the hearing, Defendant confirmed that he is not seeking to suppress the statements he made at the police station.  Defendant contends that the officers lacked reasonable suspicion at the outset; to the extent they had reasonable suspicion, they exceeded the scope of any permissible investigation; that the seizure of the video cameras and tapes was unlawful

6

because the officers were not justified in being inside the room; and that all statements made in the hotel room were made in violation of Defendant's <u>Miranda</u> rights.

### A. Reasonableness and Scope of Investigation

Defendant asserts that the officers did not have reasonable suspicion to approach and investigate the claim made by the unidentified male. Citing to <u>Florida v. J.L</u>, 529 U.S. 266, 270 (2000), Defendant contends that Officer Livingston lacked reasonable suspicion because the black male who alerted him to the room was unidentified and otherwise unknown to him, and because when the officers approached the room, they did not hear anything out of the ordinary. He asserts that because the officers lacked reasonable suspicion, they should not have investigated this uncorroborated tip, and that any evidence seized should be suppressed as the fruits of a poisonous tree. The Court disagrees.

As a threshold matter, the Court notes that no suspicion was necessary for the officers to knock on the door and ask to speak to Defendant. "A Fourth Amendment 'seizure' does not occur merely because a police officer requests permission to search an area or poses other questions to a citizen." <u>United States v. Jones</u>, 269 F.3d 919, 925 (8th Cir. 2001); <u>United States v. Woods</u>, 213 F.3d 1021, 1023 (8th Cir. 2000) (citing <u>United States v. Guerrero-Hernandez</u>, 95 F.3d 983, 986 (10th Cir. 1996) (consensual encounter does not become custodial simply because individual being questioned is the target of an investigation)). Such encounters do not require any degree of suspicion. <u>Florida v. Bostick</u>, 501 U.S. 429, 435 (1991); <u>Florida v. Rodriguez</u>, 469 U.S. 1, 5-6 (1984). A

consensual encounter does not become custodial simply because the defendant is the target of an investigation. Woods, 213 F.3d at 1022. And a consensual encounter is not transformed into an investigative stop by requesting consent to search. See United States v. Sturgis, 238 F.3d 956, 959 (8th Cir. 2001); United States v. Martin, 982 F.2d 1236, 1239 (8th Cir. 1993).

Where the police have a legitimate law enforcement objective, they do not violate the Fourth Amendment by approaching the front door of one's residence, knocking, and asking to speak to the occupant or requesting consent to search. See United States v. Weston, 443 F.3d 661, 667 (8th Cir.), cert. denied, __ U.S. __, 127 S.Ct. 417 (2006) (recognizing "knock and talk" as a reasonable investigative technique); United States v. Hammett, 236 F.3d 1054, 1059 (9th Cir. 2001) ("Law enforcement officers may encroach upon the curtilage of a home for the purposes of asking questions of the occupants."). Such encounters are consensual, and do not require any degree of reasonable suspicion. United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000) (holding that "no suspicion needed to be shown in order to justify [] 'knock and talk'").

But even if reasonable suspicion was necessary, the Court rejects Defendant's assertion that the officers lacked reasonable suspicion to conduct an investigation here. The law is clear that police officers may briefly detain an individual for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). The test is an objective one, based on the totality of the circumstances. Maryland v.

Macon, 472 U.S. 463, 470-71 (1985) (officer's actions in light of facts and circumstances relevant to Fourth Amendment assessment, not officer's actual state of mind). Furthermore, the officer's reasonable belief is judged in light of the officer's experience under the circumstances. United States v. Johnson, 64 F.3d 1120, 1124 (8th Cir. 1995). The level of proof necessary is "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Socklow, 490 U.S. 1, 7 (1989). The reasonable belief requires suspicion based on "'particularized, objective facts which, when taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)). In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

> The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. . . . [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

Florida v. Royer, 460 U.S. 491, 500 (1983).

On these facts, the officers had a reasonable, articulable suspicion that Defendant

was engaged in criminal activity or that a female might be in need of assistance based on information provided by the black male. See United States v. Fisher, 364 F.3d 970, 972-73 (8th Cir. 2004) (reasonable suspicion where unidentified complainant provided description and police observed individual matching description); United States v. Dupree, 202 F.3d 1046, 1049 (8th Cir. 2000) (reasonable suspicion based on anonymous tip regarding large group dealing drugs in alley, confirmed in part by officers' observation of five individuals in alley). Knocking on the door to assure everyone was okay was a reasonable investigatory response to that concern. Weston, 443 F.3d at 667.

Defendant's reliance upon Florida v. J.L., is misplaced. In J.L. the police stopped and frisked a man on the street corner, based solely on an anonymous telephone tip that a man wearing a plaid shirt was carrying a firearm. Here, although the informant did not provide his name, the tip was not anonymous, it was face-to-face. Officer Livingston therefore had the ability to assess not only the informant's credibility but also the source of his knowledge. See United States v. Sanchez, 519 F.3d 1208, 1214 (10th Cir.), cert. denied, __ S.Ct. __, 2008 WL 2463892 (Oct. 6, 2008) (recognizing "difference between in-person informants and anonymous calls"); accord, United States v. Gabrio, 295 F.3d 880, 883 (8th Cir. 2002) (finding it important, in assessing probable cause, that the officer "had an opportunity to assess the informant's credibility because he gave his tip in person"); United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996) (noting "personal contact with an informant can strengthen an officer's decision to rely on the information provided"). Courts have also recognized that the motive of the tipster is less suspect

10

where that individual is seeking help for a victim, as was the case here.  <u>Sanchez</u>, 519

F.3d at 1213 (citing cases).

Moreover, the Eighth Circuit has reaffirmed the principle that in determining the

reasonableness of a stop, the court must balance the public interest or "'importance of the

governmental interests alleged to justify the intrusion'" against the individual's right to be

free from intrusion.  <u>United States v. Hughes</u>, 517 F.3d 1013, 1017 (8th Cir. 2008)

(<u>quoting</u> <u>United States v. Hensley</u>, 469 U.S. 221, 228 (1985)).  "Under this test . . .

potential threats to citizens' safety are important factors."  <u>Hughes</u>, 517 F.3d at 1017

(<u>citing</u> <u>United States v. Grigg</u>, 498 F.3d 1070, 1081 (9th Cir. 2007)).  Thus, where, as

here, the police have cause for concern to the present safety of an individual, the

justification for the intrusion is greater and need for corroboration is lessened.  Indeed,

Justice Kennedy, in his concurring opinion in <u>J.L.</u> stated, "An instance where a tip might

be considered anonymous but nevertheless sufficiently reliable to justify a proportionate

police response may be when an unnamed person driving a car the police officer later

describes stops for a moment and, face to face, informs the police that criminal activity is

occurring."  <u>J.L.</u>, 529 U.S. at 276.   Under the totality of the circumstances, Officer

Livingston had reasonable cause to investigate to dispel his safety concerns based on the

face-to-face information he had received.  <u>See Sanchez</u>, 519 F.3d at 1213-15 (finding

reasonable suspicion to support investigatory stop where anonymous woman flagged

officers down to report assault she had witnessed one block away).

Nor did the officers exceed the reasonable scope of the investigation.  Defendant

asserts that upon opening the door and seeing the occupants, the basis for any further investigation ceased. But there was nothing about the scene they observed when the door was opened that should have alleviated the officers' concerns. What they observed was an older man in a hotel room with what appeared to be two young girls, one of whom was in her underwear. Based on his experience as a police officer for approximately 20 years, he was in a position reasonably to estimate their ages. And the woman who appeared to be the younger of the two was disheveled, looked upset and was not responding. Rather than allay any concerns, these facts reasonably increased the officers' suspicions, and justified further investigation. See United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002) (holding that although each factor may alone appear innocent, a combination of factors may warrant further investigation when viewed together); United States v. Bloomfield, 40 F.3d 910, 918 (8th Cir. 1994) (en banc).

The officers were therefore justified in advising Defendant of the information they had received, asking basic questions about what the occupants were doing, determining the identity and age of the occupants, and questioning Nicole separately both to ensure she was not being coerced and determine whether she was underage. See United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995) (officers are "permitted 'to graduate their responses to the demands of any particular situation'") (quoting United States v. Place, 462 U.S. 696, 710 n.10 (1983)). They also had reason to suspect that another individual could be present, and were justified in requesting consent to look inside the room both to assure the young girl's safety, and their own. See United States v. Clayton,

210 F.3d 841, 845 (8th Cir. 2000) (holding protective sweep of house "fully justified as a cautionary measure designed to discover additional persons who may have been hiding in other rooms") (citing Maryland v. Buie, 494 U.S. 325, 327 (1990)).

Because the officers had reasonable suspicion and did not exceed the reasonable scope of their investigation, Defendant's argument that the search was the product of an illegal seizure has no merit. United States v. Lyton, 161 F.3d 1168, 1171 (8th Cir. 1998); United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994).

**B. Opening of the Door and Protective Sweep**

Defendant objects to the officers' seizure of the cameras and tapes, asserting that the police were not lawfully in a position to view the inside of the room in the first place, because he did not open the door voluntarily, but rather was simply acceding to a demand under color of police authority.[1]

---

[1] At page 6 of his memorandum, Defendant appears to argue that the officers could lawfully be in a position to view the inside of the hotel room if (i) they had reasonable suspicion to investigate, and did not exceed the scope of that investigation, or (ii) Defendant voluntarily consented to open the door. (Doc. #17). It is unclear the extent to which Terry applies in the context of a knock and talk. Compare United States v. Barker, 437 F.3d 787, 790 (8th Cir. 2006) (applying reasonableness standard where officers knocked at motel room door and occupant finally answered after several minutes); Cormier, 220 F.3d at 1109 (framing issue as whether defendant voluntarily opened the door or, alternatively, whether coercive circumstances turned the consensual encounter into "one requiring objective suspicion") and United States v. Jerez, 108 F.3d 684, 691-93 (7th Cir. 1997) (recognizing that unreasonable persistence can turn "knock and talk" into investigatory stop), with United States v. Reeves, 524 F.3d 1161, 1166-67 & n.5 (10th Cir. 2008) (rejecting reasonableness standard) and United States v. Conner, 127 F.3d 663, 666 n.3 (8th Cir. 1997) (same). To the extent the reasoning of Barker applies, this Court has already determined that the officers' investigation was both reasonable and justified.

As discussed above, a proper "knock and talk" is deemed to be a consensual encounter which does not implicate the Fourth Amendment. Such action may contravene the Fourth Amendment, however, if the police use coercive or overbearing tactics which cause the defendant to open the door involuntarily, in response to a police demand. United States v. Thomas, 430 F.3d 274, 277 (6th Cir. 2005). In support of his contention that he opened the door involuntarily, Defendant relies primarily on United States v. Conner, 127 F.3d 663 (8th Cir. 1997). The facts in Conner, however, were far different from the facts presented here. As described by the Court in Conner:

> Four police officers were positioned at or near the door. They knocked longer and more vigorously than would an ordinary member of the public. The knocking was loud enough to awaken a guest in a nearby room and to cause another to open her door. Several minutes passed before Conner or Tilton responded to the knocks. Before Tilton opened the door, he looked out of the window to assess the forces outside. Only after two of the officers had identified themselves as police and demanded him to "open up" did he concede to that demand.

Id. at 666 n.2.

Here there was no such intentional show of force, nor was any "demand" made. The police simply knocked on the door. They identified themselves as police only in response to Defendant's question, and then simply stated that they wanted to talk to them to make sure everyone was okay. The minute or two that passed before the door was opened was because Defendant indicated that he needed time to get his pants on. The officers did not make any show of force, did not raise their voices, and did not demand that the door be opened. Indeed, they did not even request that the door be opened. As

the Eleventh Circuit noted in denying suppression where the request was far more forceful than here, "The occupants were free to deny that request or alternatively talk to the agent through the closed door. The decision to open the door was therefore voluntary." United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc).

Based on all of the circumstances, the Court finds that Defendant voluntarily consented to open the door, and did not do so in response to any police demand or show of force. See United States v. Crapser, 472 F.3d 1141, 1145 (9th Cir. 2007) (finding permissible "knock and talk," and that officers did not compel the defendant to open the door under the badge of authority, where officers, who were armed, knocked on door, asked defendant's companion to open the door when she came to the window, and waited two minutes before the door was opened); Cormier, 220 F.3d at 1109 (finding permissible "knock and talk" where officer knocked briefly on motel door in evening, and when defendant responded, asked if she could come inside and talk to him); Tobin, 923 F.2d at 1508 n.1, 1512 (holding that consent to open door was voluntary where agent, with backup officer standing behind him and another at the side of the house, knocked continuously for three to four minutes, calling out to the occupants, "I'm a police officer, I would like to talk to you, I need for you to come here.").

Defendant thereafter voluntarily consented to permit Officer Livingston to conduct a protective sweep, to assure no other persons were present. When officers conduct a warrantless search, it is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given. United States v. White, 81 F.3d 775,

15

780 (8th Cir. 1996); <u>United States v. Miller</u>, 20 F.3d 926, 930 (8th Cir. 1994). A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress. In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given. <u>United States v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir. 1990). Voluntariness is a fact question to be determined from the totality of the circumstances present. <u>Schneckloth</u>, 412 U.S. at 226-227; <u>United States v. Matlock</u>, 415 U.S. 164 (1974). The factors to be considered in determining whether consent is voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

<u>United States v. Alcantar</u>, 271 F.3d 731, 737 (8th Cir. 2001); <u>accord</u>, <u>United States v. Hathcock</u>, 103 F.3d 715, 719-20 (8th Cir. 1997); <u>Chaidez</u>, 906 F.2d at 381. Among the factors to be considered in examining the environment surrounding the consent, courts examine: the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search

occurred.  <u>United States v. Smith</u>, 260 F.3d 922, 924 (8th Cir. 2001); <u>Chaidez</u>, 906 F.2d at 381.  The foregoing factors are not to be applied mechanically, and no single factor is dispositive.  <u>Schneckloth</u>, 412 U.S. at 226-27; <u>Chaidez</u>, 906 F.2d at 381.

At the time he consented to the sweep, Defendant was approximately 35 years old.  There is nothing to suggested he was impaired in any fashion, and he appeared to understand what was being said.  The request was made within minutes of when the encounter first began.  Defendant was not retrained in any fashion, and no promises or threats were made.  Officer Livingston simply asked him, from outside the room, if it was okay to come in and check the bathroom area to assure no other persons were present, and Defendant said to go ahead.  Under all of the facts, the Court finds Defendant voluntarily consented to the protective sweep.

### C.  Voluntariness of Statements

The Court is also unpersuaded by Defendant's argument that all of the statements he made in the hotel room must be suppressed as a violation of his <u>Miranda</u> rights.  As the government correctly notes, Defendant's first statement, that he needed to get his pants on, was made before the door was opened, and was not even made in response to any interrogation.  <u>See</u> <u>United States v. Turner</u>, 157 F.3d 552, 556 (8th Cir. 1998) (voluntary statements made be suspect, not in response to interrogation, are not barred, "with or without the giving of <u>Miranda</u> warnings"); <u>see</u> <u>generally</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).  The same is also true with regard to several of Defendant's other statements.  His statement that they were just having some fun, was in response to a

comment made by Elaine, and his statement that Nicole was really 20 and to tell them her real age was in response to a statement made by her.  See United States v. Lockett, 393 F.3d 834, 838 (8th Cir. 2005), cert. denied, 546 U.S. 1198 (2006) (advising the defendant they were looking for him when he asked why the officers were there and explaining what defendant was suspected of are not the functional equivalent of interrogation); United States v. Mendoza-Gonzalez, 363 F.3d 788, 795 (8th. Cir. 2004) (where defendant in custody during search asked to use the phone, officer asked "why" and defendant replied he "was going to jail," question by officer did not constitute interrogation); United States v. Genao, 281 F.3d 305, 310-11 (1st Cir. 2002) (detective stating "we've got a problem here" not functional equivalent of interrogation); United States v. Briggs, 273 F.3d 767, 741 (7th Cir. 2001) (officer asking what defendant meant when he said he was going to die, not "interrogation" within meaning of Innis); United States v. Barnes, 195 F.3d 1027, 1029 (8th Cir. 1999) (not functional equivalent of interrogation when officer advised defendant he was going to be booked for crime, defendant said he "didn't think so," officer asked what he meant, and defendant made incriminating response); United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996) (no "interrogation" where defendant's statement prompted by discovery of cocaine).

        In addition, none of Defendant's statements are subject to suppression because the encounter remained a consensual one.  Statements made by a defendant who is not given his warnings under Miranda may be suppressed only if in response to police interrogation while the defendant is in custody.  See Stansbury v. California, 511 U.S. 318, 321-22

18

(1994); United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc).  Here,

Defendant's statements in the hotel room were not "custodial" for purposes of Miranda

requirements.  See United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990) (citing factors).

The officers initially remained outside the room, until Defendant expressly gave Officer

Livingston consent to conduct a brief sweep of the bathroom area.  The officers did not

advise Defendant he was under arrest, display their weapons, and did not restrain any of

the individuals at any time.  See United States v. Flores-Sandoval, 474 F.3d 1142, 1146-

47 (8th Cir. 2007).

Even if the consensual encounter escalated into an investigatory detention, the

officers, as discussed above, did not exceed the scope of that detention.  The questioning

was limited to what was necessary to dispel the officers' concerns for Nicole's safety,

and took no longer than was necessary to assure her safety.  As Defendant acknowledges

in his brief, the encounter in the hotel room took no more than ten minutes.  Thus,

Defendant was not in custody, for purposes of Miranda, when he made his statements

inside the hotel, and indeed was never in custody until he was actually placed under

arrest.

### D.  Seizure of the Cameras and Videotapes

By the end of their brief discussion with Defendant and with Nicole, the officers

had probable cause to believe that Defendant had committed a crime, and that the

cameras and videos were both contraband and evidence of the crime.  As such, the

officers were authorized to seize the items under the plain view doctrine.  United States v.

DeBuse, 289 F.3d 1072, 1074-75 (8th Cir. 2002) (holding officers legally inside of defendant's house could seize firearm in plain view); United States v. Holloway, 290 F.3d 1331, 1340 (11th Cir. 2002) (holding police lawfully inside home pursuant to what they believed was emergency situation could seize firearm in plain view).

Under the plain view doctrine, law enforcement officers may "seize evidence without a warrant when (1) 'the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed,' (2) the object's incriminating character is immediately apparent, and (3) the officer has 'a lawful right of access to the object itself.'" United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997) (quoting United States v. Hughes, 940 F.2d 1125, 1126-1127 (8th Cir. 1991), in turn quoting Horton v. California, 496 U.S. 128, 136-37 (1990)). "A law enforcement officer is permitted 'to seize evidence without a warrant when the initial intrusion is lawful, the discovery of the evidence is inadvertent, and the incriminating nature of the evidence is immediately apparent.'" United States v. Murphy, 261 F.3d 741, 743 (8th Cir. 2001) (citing United States v. Raines, 243 F.3d 419, 422 (8th Cir. 2001)).

The incriminating nature of an item is "immediately apparent," within the meaning of the second prong of the test, when officers have "probable cause to associate the property with criminal activity." United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (quoting United States v. Garner, 907 F.2d 60, 62 (8th Cir. 1990)). To meet this standard, it is not necessary that the officers be certain that the item is associated with criminal activity. It is sufficient if, based on the facts available, a reasonably cautious

person might believe that the items may be contraband, stolen property, or useful as evidence of a crime.  Weinbender, 109 F.3d at 1330.

Here, the officers were able to see the camera on the night stand from the doorway, and Officer Livingston saw the video camera on the floor when he performed a sweep of the bathroom area.[2]  For all of the reasons discussed above, the officers did not violate Defendant's Fourth Amendment rights in arriving at the places were they were able to view this evidence.  See DeBuse, 289 F.3d at 1074-75; United States v. Thomas, 249 F.3d 725, 730 (8th Cir. 2001) (holding items in plain view during protective sweep were subject to seizure); United States v. Winters, 221 F.3d 1039, 1041-42 (8th Cir. 2000) (officer who put head inside car to assure own safety, and smelled marijuana, thereby obtained probable cause to search the car and its containers); United States v. Boyd, 180 F.3d 967, 975 (8th Cir. 1999) (plain view seizure during protective sweep). Inasmuch as the items were in plain view and their incriminating character was immediately apparent, the items were subject to seizure.  Kleinholz v. United States, 339 F.3d 674, 677 (8th Cir. 2003); United States v. Murphy, 261 F.3d 741, 743 (8th Cir. 2001) (police authorized to seize items in plain view when incriminating character of objects is immediately apparent); Weinbender, 109 F.3d at 1330.  As such, Defendant's motion to suppress the cameras and videos seized should also be denied.

_____

[2]  Of course, it was no surprise that there were cameras present, as at Defendant's invitation to respond, Elaine had already stated that they were just having fun with some cameras.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements [Doc. No. 16] be **Denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 3rd day of November, 2008.